## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**SHADY HILLS ENERGY CENTER, LLC**,

    Plaintiff and Counter-Defendant,

v.

**SEMINOLE ELECTRIC COOPERATIVE, INC.**,

                                       Case No. 8:20-cv-81-WFJ-JSS

    Defendant, Counter-Plaintiff, and
    Third-Party Plaintiff,

v.

**EFS SHADY HILLS EXPANSION HOLDINGS, LLC; EFS SHADY HILLS, LLC; GENERAL ELECTRIC CREDIT CORPORATION OF TENNESSEE, INC.; GE CAPITAL US HOLDINGS, INC.; and GE CAPITAL GLOBAL HOLDINGS, LLC**,

    Third-Party Defendants.

_____/

## <u>ORDER</u>

Before the Court is Plaintiff's Motion for Partial Summary Judgment (Dkt. 171), Third-Party Defendants' Motion for Summary Judgment (Dkt. 172), and Defendant's Motion for Summary Judgment (Dkt. 175). Each motion has been opposed (Dkts. 212, 211, 208), and each opposition filing has been met with a reply (Dkts. 226, 225, 227). On August 26, 2022, the Court held a hearing on these

matters. And, at the Court's invitation, the opposing sides filed closing comments (Dkts. 250 & 251). With the benefit of full briefing and able argument by both sides, the Court grants-in-part and denies-in-part all three motions.

## FACTUAL BACKGROUND

In March 2016, Defendant Seminole Electric Cooperative, Inc. issued a request for proposals seeking a contractor to provide for Defendant's anticipated power supply needs. Dkts. 171 at 9; 175 at 10. Third-Party Defendant GE Energy Financial Services ("GE EFS") was ultimately selected. *Id.* And, on December 15, 2017, Defendant and Plaintiff Shady Hills Energy Center, LLC—a special purpose vehicle created by GE EFS to facilitate the transaction—executed the Tolling Agreement. Dkt. 171 at 10, 17.[1]

Thereunder, Plaintiff would be responsible for developing, financing constructing, operating, and owning a natural gas-fired electric generation plant ("the Facility"). *Id.* at 17; Dkt. 175 at 11. Defendant would in turn purchase the Facility's output at a fixed price for thirty years subject to a purchase option. Dkts. 171 at 17; 175 at 11. Defendant was also obligated to reasonably cooperate in Plaintiff's financing efforts. Dkts. 171 at 11; 175 at 24.

---

[1] GE EFS is a business unit of Third-Party Defendant GE Capital Global Holdings. In this case, the term "Tolling Agreement" is used. It means the main contract at issue here. The term does not mean an agreement to stop of "toll" the running of a period of time or period of limitation.

In early 2019, however, a dispute arose concerning Plaintiff's proposed financing. Dkts. 171 at 19–20; 175 at 11–12. Defendant informed Plaintiff that, in Defendant's view, the proposed consent and intercreditor agreements were contrary to Defendant's interests as established by the underlying Tolling Agreement and attached Purchase and Sale Agreement ("Form PSA"). Dkt. 171 at 19–20; 175 at 11–12. Defendant refused to sign. Dkt. 171 at 19–20; 175 at 11–12. Reconciliation attempts failed, and the Facility was never built. Dkt, 171 at 19–20; 175 at 11–12.

On March 6, 2020, Defendant provided Plaintiff with a notice terminating the Tolling Agreement. Dkt. 175 at 42. Plaintiff served a similar notice on May 14, 2020. Dkt. 171 at 21.

## PROCEDURAL BACKGROUND

On May 18, 2020, following the exchange of termination notices, Plaintiff filed its Amended Complaint. Dkt. 52. Therein, Plaintiff alleges breach of contract (Count I) and breach of the implied covenant of good faith and fair dealing (Count II). *Id.* at 25–27. Plaintiff also requests a declaratory judgment concerning the enforceability of the Form PSA (Count III). *Id.* at 28.

Defendant responded with a motion to dismiss. Dkt. 57. The Court denied the motion in full, leading Defendant to file an answer on July 16, 2020. Dkts. 62 & 65. Defendant's Answer denied all of Plaintiff's pertinent claims, raised nine

affirmative defenses, and collectively asserted eight counts against Plaintiff and Third-Party Defendants. *Id.*

Plaintiff and Third-Party Defendants similarly responded with a motion to dismiss. Dkt. 76. The Court granted it in part and denied it in part. Dkt. 80. And, on October 20, 2020, Defendant filed its Amended Answer. Dkt. 84.

In its Amended Answer, Defendant brings five counterclaims and seven third-party claims. *Id.* Against Plaintiff and Third-Party Defendants EFS Shady Hills, EFS Shady Hills Expansion Holdings, and General Electric Credit Corporation of Tennessee, Defendant alleges breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and negligent misrepresentation (Count III). *Id.* at 53–60. Against Third-Party Defendants GE Capital US Holdings and GE Capital Global Holdings, Defendant alleges tortious interference with contract (Count VI) and negligent misrepresentation (Count VII). *Id.* at 65–68. Additionally, Defendant requests a declaratory judgment concerning the termination of the Tolling Agreement and the enforceability of the Form PSA (Count IV), while seeking rescission in the alternative (Count V). *Id.* at 60–64.

On November 10, 2020, Plaintiff and Third-Party Defendants filed a response to Defendant's Amended Answer. Dkt. 89. Plaintiff and Third-Party Defendants then filed an amended response on November 30th, leading the Parties to engage in substantial discovery. Dkt. 93.

4

There are now three pending summary judgment motions before the Court. Dkts. 171, 172, 175.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify

affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party and must resolve any reasonable doubts in the non-moving party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

### I.   Plaintiff's Motion for Partial Summary Judgement

Plaintiff moves for a) summary judgment on Count III of its Amended Complaint; b) "partial summary judgment on all counts and counterclaims on the question of whether, as a matter of law, [Plaintiff's] long-term project financing could remain in place if [Defendant] exercised its purchase option"; and c) summary judgment on all of Defendant's remaining counterclaims. Dkt. 171 at 4.

*a) Count III*

Plaintiff argues that the Form PSA is an unenforceable agreement that should be severed from the Tolling Agreement and disregarded because it contains draft notes, includes options, and leaves open essential terms. *Id.* at 25–27. These

blank essential terms include: the parties to the purchase and sale agreement, the effective date of the agreement, the entity being conveyed, the disclosures and releases to be exchanged, the identity of the seller or the company being conveyed, and the covenants in place on the date of sale. *Id.*  Defendant conversely maintains that, in the context of this transaction, the Form PSA's blank terms are properly considered nonessential or otherwise determinable. Dkt. 212 at 15–17. Defendant also argues that the Tolling Agreement evinces the Parties' intent to be substantially bound by the Form PSA with respect to Defendant's exercise of its future purchase option, rendering severance inappropriate. *Id.* at 17–21. Upon consideration, the Court will not sever or disregard the Form PSA.

The important point to note here is that Defendant is not seeking to enforce the Form PSA as a separate contract and receive damages for breach of it. Rather, Defendant seeks to show the Parties reasonably intended to be bound by the general, albeit not always definite, terms within the Form PSA and that Defendant was not unreasonable in relying on the "free and clear" language therein, which is definite.

Florida courts have held that "where the essential terms of an agreement remain open, subject to future negotiation, there can be no enforceable contract." *CSX Transp., Inc. v. Pro. Transp., Inc.*, 467 F. Supp. 2d 1333, 1340 (M.D. Fla. 2006) (citations omitted). Indeed, "[a]s a general rule, [the] presence of blanks in a

contract is fatal to the enforcement if the blanks occur in a provision dealing with an essential term of the contract." *Innkeepers Int'l, Inc. v. McCoy Motels, Ltd.*, 324 So. 2d 676, 678 (Fla. 4th DCA 1975) (citations omitted). "The definition of "essential term" varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis." *Lanza v. Damian Carpentry, Inc.*, 6 So. 3d 674, 676 (Fla. 1st DCA 2009).

Here, the Form PSA's blanks deal with essential terms because, when viewed in conjunction with the Tolling Agreement, the blanks render the Form PSA "not specific enough in its terms to be capable of [independent] implementation." *CSX Transp., Inc.*, 467 F. Supp. 2d at 1341. Defendant's appeal to determinability cannot overcome this shortcoming; for, while the Form PSA is "incorporated in and [is] intended to be part of the [Tolling Agreement,]" the Tolling Agreement also provides that: "[i]n the event [Defendant] exercises its Purchase Option hereunder . . . the Parties will consummate [Defendant's] purchase . . . pursuant to a Purchase and Sale Agreement *substantially* in the form attached hereto[.]" Dkt. 166-1 at 13, 64 (emphasis added). The Court cannot replace the term "substantially" with the term "identically." Hence, any attempt by the Court to fill in the Form PSA's blanks would amount to enforcing an "agreement to agree" for which there is no remedy. *See CSX Transp., Inc.*, 467 F. Supp. 2d at 1339–41. This is beyond the Court's power.

Even so, the Form PSA's independent unenforceability does not automatically render it severable. The Eleventh Circuit has held that severance of an unenforceable provision is appropriate only "if the performance as to which the agreement is unenforceable is not an *essential part* of the agreed exchange." *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1352 (11th Cir. 2014) (citations omitted). Courts have also framed this question in terms of whether severance would "undermine the parties' intent." *Lemos v. Sessa*, 319 So. 3d 135, 142 (Fla. 3d DCA 2021) (citations omitted); *see also Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005) (finding that a void provision can be severed where it does not affect the intent of the parties). Either way, a contract is only "severable where the [unenforceable] portion of the contract does not go to its essence and, where, with the [unenforceable] portion eliminated, there still remain valid legal promises on one side which are wholly supported by valid legal promises on the other." *Gold, Vann & White, P.A. v. Friedenstab*, 831 So. 2d 692, 696 (Fla. 4th DCA 2002).

The Court has no doubt that severing the entire Form PSA would upend the Parties' intent concerning Defendant's bargained-for purchase option. This remains true even if the Court accepts that section 11.2 of the Tolling Agreement is primarily responsible for creating and defining Defendant's purchase option, as section 11.2(e) elucidates the substantial meaning that the Form PSA holds.

Specifically, the Form PSA lends Defendant's purchase option, as it exists within the Tolling Agreement, functional meaning in the form of a 58-page draft. Dkt. 166-1 at 64. Plaintiff admits as much by conceding that the Form PSA is "illustrative of the parties' intent[,]" and that "it memorializes at length the parties' understanding of how a purchase would occur if [Defendant] exercised its purchase option." Dkt. 171 at 28, 31. To disregard the entire Form PSA, as Plaintiff requests, would therefore be to strike at an essential aspect of the Parties' understood agreement.

The Court declines to exercise its discretion to grant declaratory relief in such a way. The Form PSA was intended by the Parties to show or outline what the Parties planned to do in the event of a purchase option exercise by Defendant. Defendant intends to show at trial that the Form PSA colored and supported Defendant's reluctance to agree to the lender subordination contract. It would be a bold court indeed that simply tossed out a lengthy addendum to a detailed contract once the dispute was submitted for adjudication. The Parties negotiated over and bargained for this lengthy addendum. They may argue its import or irrelevance to the jury.

b) *Long-Term Financing*

Plaintiff next requests partial summary judgment on the question of whether long-term financing could remain in place if Defendant exercised its purchase

option. Because the Parties agree that the Tolling Agreement contemplates the possibility of remaining long-term financing, however, the question is more accurately framed as whether Defendant retained a contractual right to prevent this possibility from materializing. Dkt. 247 at 19–20. Plaintiff argues that a plain reading of the Tolling Agreement indicates that Defendant retained no such right. Dkt. 171 at 28–41.[2] Defendant conversely maintains that the "free and clear" language of the Form PSA establishes Defendant's right to prevent remaining debt and that Plaintiff has failed to "show that its interpretation of the Tolling Agreement and PSA is the only reasonable interpretation." Dkt. 212 at 34.

This question goes to the heart of the Parties' dispute. It also predominates Plaintiff's claim that Defendant breached the Tolling Agreement by failing to reasonably consent to Plaintiff's proposed financing documents. Yet, Plaintiff has not moved for summary judgment on its breach of contract claim. Plaintiff's reluctance to do so, moreover, is presumably informed by the fact that where the issue is whether consent was unreasonably withheld, "summary disposition of a breach of contract claim is rarely suitable." *Munoz Hnos, S.A. v. Ed. Televisa Int'l, S.A.*, 121 So. 3d 100, 104 (Fla. 3d DCA 2013) (citations omitted). That said,

---

[2] Plaintiff also presents extrinsic evidence which allegedly confirms that the Parties understood that Plaintiff "could obtain project financing that would remain in place through closing of any purchase option." Dkt. 171 at 41–44.

Plaintiff cannot circumvent this limitation unless Plaintiff shows that, as a matter of law, long-term debt could remain in place against Defendant's will.

The starting point for interpreting a contract is the "natural and plain meaning" of the contract's language. *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) (citations omitted). If the terms are not ambiguous, "the parties' intent must be discerned from the four corners of the document." *Fecteau v. Se. Bank, N.A.*, 585 So. 2d 1005, 1007 (Fla. 4th DCA 1991) (citations omitted). If the terms are ambiguous, "and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties." *Bacardi v. Bacardi*, 386 So. 2d 1201, 1203 (Fla. 3d DCA 1980). And if the terms remain "disputed and reasonably susceptible to more than one construction, an issue of fact is presented which cannot properly be resolved by summary judgment." *Quayside Assocs., Ltd. v. Harbour Club Villas Condo. Ass'n, Inc.*, 419 So. 2d 678, 679 (Fla. 3d DCA 1982) (citations omitted).

Here, ambiguity exists because the contractual terms are reasonably susceptible to more than one interpretation concerning whether debt and liens could remain in the event that Defendant exercised its purchase option. On one hand, section 2.01 of the Form PSA—which provides that "at the Closing . . . [Defendant] shall purchase, accept and assume from Seller, *free and clear of any*

12

*Encumbrances*, all of Seller's right, title and interest in, to and *under* the Acquired
Interests"—suggests that Defendant maintained a right to exercise its purchase
option free of any remaining debt on Plaintiff or the Facility. On the other hand,
separate provisions—which demonstrate that the Form PSA's mechanics account
for the continued existence of financing—suggest that "there could be debt and
liens on [Plaintiff] at the time of sale, and that only the Acquired Interests were to
be conveyed 'free and clear of any Encumbrances.'" Dkt. 171 at 31–38 (discussing
multiple Form PSA draft notes, Form PSA recitals, and Form PSA §§ 3.02(a),
4.02(a), 4.05(c), etc.).

Notwithstanding, Plaintiff contends that it would be nonsensical to interpret
section 2.01 of the Form PSA to mean that Plaintiff had to be free and clear of
encumbrances at the time of purchase, as that reading would create an
irreconcilable conflict with the rest of the Tolling Agreement. *Id.* at 33–34. In
reality, though, such a reading only creates irreconcilable conflict with Plaintiff's
interpretation of the rest of the Tolling Agreement. Indeed, when the provisions
cited by Plaintiff are viewed as contingencies in the event that Defendant decided
to assume debt for strategic reasons upon purchase, the conflict largely disappears.
Section 2.01 could therefore reasonably be interpreted to align with the rest of the
contract, or the rest of the contract could reasonably be interpreted to align with the
plain language of section 2.01. Which method of interpretation is correct is an

issue of fact requiring extrinsic evidence bearing on the Parties' intent. *See Bacardi*, 386 So. 2d at 1203.

Still, Plaintiff's extrinsic evidence cannot overcome the general rule that "if a contract is ambiguous, the parties' intent becomes a question of fact for the fact-finder, precluding summary judgment." *Life Care Ponte Vedra, Inc. v. H.K. Wu*, 162 So. 3d 188, 192–93 (Fla. 5th DCA 2015) (citation omitted). Exceptions to this rule exist only where "the ambiguity can be resolved by *undisputed* parol evidence . . . ." *Id.* (citation omitted) (emphasis added). And that situation does not exist here because Defendant specifically disputes Plaintiff's extrinsic evidence as it relates to intent.

Accordingly, the Court is unable to resolve this issue without weighing the credibility of deposition testimony. Dkt. 212 at 37–42. Because such weighing is properly left to the jury, the Court denies summary judgment on this issue.

c) *Defendant's Counterclaims*

Plaintiff seeks summary judgment on Defendant's counterclaims by incorporating the arguments presented in Third-Party Defendants' Motion for Summary Judgment. Dkt. 171 at 46 (citing Dkt. 172). The Court finds Plaintiff's incorporation appropriate and efficient. Hence, each of Defendant's counterclaims will be considered in turn.

i) *Breach of Contract*

14

First, Plaintiff requests summary judgment on Defendant's breach of contract counterclaim. Plaintiff's and Defendant's arguments nevertheless revolve around the same intent-based issue of fact discussed above; namely, whether Plaintiff's long-term financing could remain in place if Defendant exercised its purchase option.[3] The only difference here is a reversal of roles. Thus, for the reasons expressed in the previous section, this counterclaim also presents a question for the jury that cannot be resolved at the summary judgment stage.

### ii)     *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Second, Plaintiff argues that "[Defendant's] implied covenant claim necessarily fails because [Plaintiff has] acted consistent with [its] rights and obligations under the Tolling Agreement." Dkt. 172 at 12. Once again, though, the obligation in question directly pertains to Defendant's alleged "right to purchase [Plaintiff's] equity free and clear of encumbrances." Dkt. 84 at 58. The Court cannot grant summary judgment on this counterclaim without also determining that

---

[3] Defendant maintains that remaining long-term financing was within its discretion under the Tolling Agreement. Plaintiff's proposed financing documents, among other things, reflected the opposite. Defendant refused to sign Plaintiff's proposed third-party financing documents, the Parties could not resolve their differences, and Plaintiff eventually brought suit. Thereafter, Defendant counterclaimed that Plaintiff "materially breached Section 3.8 of the Tolling Agreement by failing to provide reasonably satisfactory evidence of its capability to obtain Financing in compliance with the Tolling Agreement." Dkt. 84 at 54. Plaintiff maintains that its proposed financing documents did comply with the Tolling Agreement because Plaintiff "was expressly permitted to secure project financing to construct the Facility, including long-term project financing that could remain in place upon [Defendant's] potential purchase of the equity interests in [Plaintiff], and neither the Tolling Agreement nor the Form PSA placed any constraints on [Plaintiff's] discretion [to do so]." Dkt. 172 at 10–11.

Defendant retained no such right under the Tolling Agreement. For the aforementioned reasons, the Court declines to do so.

### iii)     *Negligent Misrepresentation*

Third, Plaintiff moves for summary judgment on Defendant's negligent misrepresentation counterclaim. Therein, Defendant alleges that Plaintiff made false statements of material fact including "that [it] would be able to finance the project and construct the Facility under the terms of the Tolling Agreement, without amending [it] or impairing [Defendant's] rights[.]" *Id.* at 59. Defendant also argues in its reply that evidence shows Plaintiff "never intended to finance the project in accordance with the terms of the Tolling Agreement[.]" Dkt. 211 at 38.

Plaintiff responds that this counterclaim merely "'recast[s] causes of action that are otherwise breach-of-contract claims as tort claims.'" Dkt. 172 at 13 (citing *Spears v. SHK Consulting & Dev., Inc.*, 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018)). Plaintiff additionally maintains that, while Defendant has only alleged misrepresentation concerning future performance, "[a] negligent misrepresentation claim must be based on a misrepresentation of a 'past or existing fact.'" *Id.* at 20 (citing *Simpson v. Zwinge*, No. 12-60817-CIV-ROSENBAUM/SELTZER, 2013 WL 12141352, at *2 (S.D. Fla.), *aff'd per curiam*, 531 F. App'x 985 (11th Cir. 2013).

16

The Court largely agrees with Plaintiff. The Eleventh Circuit has interpreted Florida's independent tort doctrine to mean that "a party still must demonstrate that . . . the tort is independent of any breach of contract claim." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014) (citation omitted). In an attempt to escape this burden, Defendant cites multiple cases which find that, "when . . . fraud occurs in . . . connection with misrepresentations, statements, or omissions which cause the complaining party to enter into a transaction, then such fraud is fraud in the inducement and survives as an independent tort." *Ladner v. AmSouth Bank*, 32 So. 3d 99, 105 (Fla. 2d DCA 2009) (citation omitted). But Defendant has not pled fraud. Dkt. 84 at 58. Defendant's claim for negligent misrepresentation, moreover, cannot be sustained by an allegedly false statement concerning future performance of the very financing obligation that forms the core of Defendant's breach claim.

As a preliminary matter, these claims are not factually separate and distinct. Defendant can only show that a negligent misrepresentation occurred by similarly showing that Defendant's financing-based conduct constituted a breach. *See Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014 WL 2215770, at *5 (S.D. Fla. May 29, 2014) (stating that, "[i]n assessing whether fraud in the inducement is distinct from a claim arising under a contract, the critical inquiry focuses on whether the alleged fraud is separate from the performance of the contract.") (citation omitted).

17

All the same, the Court sees no reason to apply intent-based exceptions to Defendant's negligent misrepresentation claim. "As a general rule, 'a false statement of fact, to be a ground for fraud, must be of a past or existing fact, not a promise to do something in the future.'" *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005) (citation omitted). "An exception to this general rule is that 'where the promise to perform a material matter in the future is made without any intention of performing or made with the positive intention not to perform' a cause of action for fraud may proceed to a jury." *Id.* (citations omitted). Yet, Defendant did not plead that Plaintiff had the present intent to avoid performance. Defendant instead claimed that Plaintiff "subsequently stated that they could not (or would not) obtain financing for the Facility without amending the Tolling Agreement . . . ." Dkt. 84 at 59. Moreover, the alleged evidence of present intent later discovered by Defendant (Dkt. S-220 at 39), even accepted as true, cannot establish that Plaintiff "never intended to finance the project in accordance with the terms of the Tolling Agreement." Dkt. 211 at 39. Plaintiff's position has ever been that its intended financing was commercially reasonable, and that said financing accorded with Plaintiff's obligations under the Tolling Agreement. *Id.* at 39.

The Court therefore grants Plaintiff summary judgment on Defendant's negligent misrepresentation counterclaim.

*iv)*    *Declaratory Judgment*

Fourth, Plaintiff requests summary judgment on Defendant's declaratory judgment counterclaim. Defendant seeks a declaration from this Court that a) the Tolling Agreement terminated on March 6, 2020, and b) the Form PSA is an integral and essential part of the Tolling Agreement that is not severable from the Tolling Agreement. Dkt. 84 at 60–63. Plaintiff argues that this claim "does not ask the Court to resolve anything other than the merits of [Defendant's] breach of contract claim—and . . . whether the [Plaintiff] breached the contract before [Defendant] stopped performing." Dkt. 172 at 11–12. Defendant responds that, "[g]iven the complex legal issues presented here, and in light of [Plaintiff and Third-Party Defendant's] contention that [Defendant] has no damages, a claim for declaratory relief to resolve key disputed legal questions is warranted." Dkt. 211 at 28.

The Court agrees with Plaintiff insofar as the Court finds that Defendant's declaratory judgment claim necessarily encompasses breach of contract issues better left to resolution at trial. Further, as Defendant notes, "the Court has 'unique and substantial discretion' to decide whether to hear a declaratory judgment claim." Dkt. 211 at 28 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). Accordingly, the Court declines to exercise its discretion to issue a declaratory judgment and instead chooses to grant Plaintiff summary judgment on

19

this counterclaim so as to allow these breach of contract issues to be resolved at
trial.

> *v)   Rescission*

Fifth, Plaintiff moves for summary judgment on Defendant's alternative
counterclaim for rescission. Plaintiff offers four arguments on this point. Dkt. 172
at 14–17. Notwithstanding, the Court finds it necessary to address only Plaintiff's
argument concerning Defendant's entitlement to equitable relief.

"It is undisputed that the absence of a remedy at law is a required element of
the rescission action." *Anchor Bank, S.S.B. v. Conrardy*, 763 So. 2d 360, 361 (Fla.
4th DCA 1998) (citation omitted). That said, "[c]ourts have discretion whether or
not to order rescission even if a party proves the elements." *Comprehensive Care
Corp. v. Katzman,* No. 8:09-CV-01375, 2010 WL 3190136 at *5 (M.D. Fla. July
30, 2010) (citing *Billian v. Mobile Corp.,* 710 So. 2d 984, 990–91 (Fla. 4th DCA
1998) (holding that, "[r]escission is not available as a matter of right. Relief by
way of rescission lies within the sound discretion of the court, to be exercised
according to what is reasonable and proper under the circumstances of each
particular case[.]")). For, "[r]escission is a harsh remedy, disfavored by the courts."
*Id.* at *5 (citation omitted).

The presence of an appropriate legal remedy—contract damages—is clear in
this case. If (as Defendant claims) the Tolling Agreement excludes unconsented

remaining long-term financing, then Defendant will receive the breach damages that it is entitled to at law. If (as Plaintiff claims) the Tolling Agreement permits remaining long-term financing, then it would be unreasonable to grant Defendant relief by way of rescission, effectively allowing Defendant to wholly escape a contract that it negotiated for but later found unfavorable. Either way, Defendant is not entitled to the equitable relief requested.

The Court therefore grants Plaintiff summary judgment on Defendant's rescission counterclaim.

vi)     *Evidence of Damages*

Plaintiff concludes by arguing that each of Defendant's counterclaims fail "because [Defendant] has failed to generate any competent evidence of damages." Dkt. 172 at 21. But Plaintiff's argument is unavailing.

Defendant has supported its allegations of contract and implied covenant breach damages with specific evidence including an interrogatory response, deposition testimony, a supplemental interrogatory response, contracts, invoices, and spreadsheets. This evidence collectively places Defendant's allegations beyond the category of "conclusory" and creates a "genuine factual dispute sufficient to permit a reasonable jury to return a verdict for the non-movant[.]" *Rambarran v. Bank of Am., N.A.*, 609 F. Supp. 2d 1253, 1257 (S.D. Fla. 2009) (citations omitted).

As such, Plaintiff is not entitled to summary judgment on Defendant's remaining counterclaims.

## II.    Third-Party Defendants' Motion for Summary Judgment

Third-Party Defendants request a) summary judgment on all third-party claims asserted within Counts I-VII of Defendant's Answer; and b) partial summary judgment on "the issue of whether the Shady Hills Parties' long-term project financing could remain in place upon [Defendant's] potential purchase of the equity interests in [Plaintiff]." Dkt. 172 at 4.

The Court has already determined that Plaintiff is entitled to summary judgment on Defendant's requests for declaratory relief (Count IV) and rescission (Count V). Therefore, Third-Party Defendants are also entitled to summary judgment on these issues.

Additionally, the issue of long-term financing has been discussed at length above. Nothing in Third-Party Defendants' motion changes the Court's analysis. As a result, like that of Plaintiff, Third-Party Defendants' request for summary judgment on the issue of long-term financing is denied.

The Court will consider each of Third-Party Defendants' remaining summary judgment requests in turn.

a) *Counts I-VII*

i)    *Breach of Contract*

22

Third-Party Defendants begin by taking aim at Defendant's third-party breach theories. Defendant presents three. Dkt. 211 at 21–28. Notwithstanding, each fails to create a triable breach claim against Third-Party Defendants.

As an initial matter, Third-Party Defendants' obligations flow from section 11.5 of the Tolling Agreement ("Sponsor and Parent Obligations"). Dkt. S-193-1 at 62. Section 11.5(d) then provides that each Sponsor and Parent will also be "bound by and comply with" the terms of section 11.2 ("Buyer's Option to Purchase All Equity Interests of Seller") and section 11.3 ("Prohibition on Transfers Prior to Commercial Operation; Right of First Offer"). *Id.* at 59–62. It follows that Defendant's third-party breach theories must, at a minimum, relate to an alleged breach of these obligations.

Defendant's first theory—that Plaintiff and Third-Party Defendants refused to pursue alternative financing consistent with the terms of the Tolling Agreement—fails to meet this basic requirement. *See* Dkt. 211 at 23–25. Even assuming *arguendo* that Plaintiff "materially breached Section 3.8 of the Tolling Agreement by failing to provide reasonably satisfactory evidence of its capability to obtain Financing[,]" and that Plaintiff then breached sections 15.1(b)(5) and 12.1(b)(4) by refusing to pursue alternative financing, Third-Party Defendants' obligations were not informed by these provisions. Dkt. 84 at 54–55; *see* Dkt. S-193-1.

Further, any alleged breach of section 11.2(e) on this theory is hypothetical at best. This is because Third-Party Defendants' future breach would be contingent on remaining long-term financing which might or might not violate provisions that do not themselves impose primary duties on Third-Party Defendants. Thus, the Court cannot entertain Defendant's third-party breach claim on these grounds. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotation marks omitted).

Defendant's second theory—that Plaintiff and Third-Party Defendants failed to provide notice of Plaintiff's ability to obtain financing as required by the Tolling Agreement—fails for the same reasons. Dkt. 221 at 25–26. As Defendant states, section 3.8 of "the Tolling Agreement required [*Plaintiff*] to provide evidence of its capability to obtain Financing for the construction of the Facility[.]" *Id*. at 25. But section 3.8 has no bearing on Third-Party Defendants' contractual obligations. Further, nothing in the caselaw cited by Defendant supports an extension of these section 3.8 duties.[4] As a result, the Court cannot entertain this basis for a breach claim either.

---

[4] *See, e.g.*, *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1319 (11th Cir. 2022) (involving no third parties).

Defendant's third theory—that Third-Party Defendants GE Credit, EFS Shady Hills, and EFS Shady Hills Expansion Holdings directly failed to comply with their Sponsor and Parent Obligations—is multifaceted. Dkt. 211 at 26–28. Its parts, however, are individually flawed, causing this theory to necessarily fail as a whole.

To begin, Third-Party Defendants' alleged intent not to be bound by the Form PSA does not constitute a breach because it did not materialize into any action by Third-Party Defendants which itself violated the Tolling Agreement. Indeed, as discussed above, *Plaintiff* was required to produce proper financing under the Tolling Agreement and attached Form PSA, not Third-Party Defendants. The proposed financing documents that Defendant ultimately found objectionable, moreover, were proposed by Plaintiff, not Third-Party Defendants. Thus, Defendant's intent theory essentially asks this Court to interpret section 11.2(e) as a means of holding Third-Party Defendants liable for anything for which Plaintiff might be liable. But this represents a departure from the terms and structure of the Parties' contract, and Court is not willing to endorse that.

Defendant then moves to sections 11.3 and 11.5. *Id.* at 27. Section 11.3 addresses interest transfers prior to commercial operation and specifically provides that:

Transfer Transaction means (i) any transaction or series of related transactions entered into by Seller to sell, transfer, assign, convey or

> otherwise dispose of the entirety of the Facility, or (ii) any transaction or series of related transactions that would result in Sponsor and all other Non-Controlling Persons no longer owning, directly or indirectly, any ownership interests in Seller; provided, however, any such transaction or series of transactions between Sponsor (or subsidiary of Sponsor that directly or indirectly owns Seller) and an Affiliate of Sponsor shall not constitute a Transfer Transaction. Neither Seller nor Sponsor may enter into a Transfer Transaction (i) prior to the Commercial Operation Date, and (ii) after the Commercial Operation Date, unless . . . .

Dkt. S-193-1 at 60–61. Accordingly, it makes little sense to claim that Third-Party Defendants breached this provision merely because the proposed financing documents that Plaintiff produced gave "lenders the ability to assign their rights and interests in the Facility, the Tolling Agreement, and [Plaintiff's] equity to any qualified transferee." Dkt. 211 at 27. Third-Party Defendants have effectuated no "Transfer Transaction." No one has. Hence, while the Plaintiff's actions are perhaps dispositive in relation to questions of Plaintiff's breach and the reasonableness of Defendant's refusal to sign the consent agreement, said actions are inapposite in relation to Third-Party Defendants' obligations under section 11.3.

This is true even in view of General Electric's corporate structure. To be sure, co-existing in a related corporate chain does not make Plaintiff and Third-Party Defendants one entity with shared liabilities under the Tolling Agreement,

nor does it render Third-Party Defendants otherwise liable.[5]  If that is the

protection Defendant sought, Defendant should have specified as much in the

contract.

Finally, Defendant claims that Third-Party Defendants breached sections

11.5(b) and (c) when Plaintiff's equity interests were transferred from EFS Shady

Hills to EFS Shady Hills Expansion Holdings in April 2019. Dkt. 211 at 28.

These provisions generally require the Sponsor and Parent to ensure that new

owners of Plaintiff's equity interests "acknowledge and agree in writing to

[Defendant's] rights to acquire all direct equity interests in [Plaintiff] pursuant to

this Article 11" and to "provide written notice to [Defendant]" within five days of

the equity interest transfer. The Court agrees with Defendant that neither

requirement was technically met.

Still, this minor failure did not injure Defendant and undoubtedly

represents a shortcoming in form rather than substance. In Defendant's words,

"Sections 11.3 and 11.5 were bargained for to protect [Defendant's interests]

against unknown transfers." *Id.* at 27. Sections 11.5(b) and (c) presumably

_____

[5] *See Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998) (finding that "A party seeking to pierce the corporate veil and hold a parent corporation liable for the actions of its subsidiary must prove: (1) that the subsidiary was a 'mere instrumentality' of the parent, *and* (2) that the parent engaged in 'improper conduct' through its organization or use of the subsidiary[.]  Improper conduct is present only in 'cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.'") (citations omitted).

achieve this end by requiring the Sponsor and Parent to put transferees on notice of Defendant's purchase option and by providing Defendant with the information needed to establish acknowledgement by transferees. EFS Shady Hills Expansion Holdings, an entity Defendant wishes to treat as equal to Plaintiff, clearly had notice of Defendant's binding Article 11 rights. The record also demonstrates that Defendant was provided notice as early at 2017 that EFS Shady Hills Expansion Holdings would take over Plaintiff's equity upon incorporation. Dkt. 166-38 at 2–9. Thus, there are no damages flowing from Third-Party Defendants' failure to strictly comply with sections 11.5(b) and (c).

Under Florida law, damages are an essential element of an action for breach of contract. *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1300 (M.D. Fla. 2009) (citation omitted). This element is missing from Defendant's final third-party breach theory. As a result, Defendant claim is fatally flawed. And, in view of the above discussion, the Court grants summary judgment on Defendant's third-party breach claims in favor of the Third-Party Defendants.

ii)       *Breach of the Implied Covenant of Good Faith and Fair Dealing*

It is well established that, "[b]ecause the implied covenant is not a stated contractual term, to operate it attaches to the performance of a specific or express contractual provision. There can be no cause of action for a breach of the implied covenant 'absent an allegation that an express term of the contract has been

breached.'" *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 792 (Fla. 2d DCA 2005) (quoting *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001)).

Here, the Court has already established that Defendant failed to bring an actionable breach claim against Third-Party Defendants. The Court therefore grants Third-Party Defendants summary judgment on Defendant's third-party implied covenant breach claim as well.

### iii)   *Negligent Misrepresentation*

Next, Third-Party Defendants challenge both of Defendant's third-party negligent misrepresentation claims. The first of these claims is against Third-Party Defendants EFS Shady Hills, EFS Shady Hills Expansion Holdings, and General Electric Credit Corporation of Tennessee. Dkt. 84 at 58. The second is against Third-Party Defendants GE Capital Global Holdings and GE Capital US Holdings ("GE Parents"). *Id.* at 67. This distinction aside, however, both claims are essentially the same as Defendant's negligent misrepresentation counterclaim; namely, the GE contracting parties falsely represented that the Facility would be financed and constructed under the terms of the Tolling Agreement without amendment or impairment of Defendant's rights thereunder. *Id.* at 59, 67.

These claims all fail for the same reason—Defendant does not plausibly allege a false statement of past or existing fact beyond the Tolling Agreement itself

or an independent future promise which Third-Party Defendants had no intention of performing. *See Wadlington*, 907 So. 2d at 632 . In an attempt to establish some combination of the two, Defendant claims that Third-Party Defendants were "never concerned with the terms of the Tolling Agreement because they always knew that in order to secure their preferred form of financing, lenders would seek to limit [Defendant's] rights[.]" Dkt. 211 at 40. To support this claim, Defendant points to an internal GE email discussing Defendant's rights upon the event of default and deposition testimony which allegedly shows that particular Third-Party Defendant employees did not a) read the Tolling Agreement during financing discussions with potential lenders, or b) read the proposed financing documents while having meetings with Defendant to resolve the financing dispute. *Id.* at 38–40.

Even when taken as true and considered in the light most favorable to Defendant, this evidence only shows that Third-Party Defendants intended to perform in accordance with their understanding of the Tolling Agreement. Further, even assuming that this understanding was mistaken, Defendant cannot reasonably extrapolate, based on this evidence alone, that Third-Party Defendants simply never intended to perform.

In sum, this contract dispute is focused on the Parties' intent as it relates to the Tolling Agreement's meaning. The Court will not allow Defendant to repackage this intent question in the trappings of tort by merely wrapping it over

with conclusory allegations that Third-Party Defendants never intended to perform. As such, the Court grants Third-Party Defendants summary judgment on Defendant's third-party negligent misrepresentation claims.

### iv) *Tortious Interference*

Finally, Third-Party Defendants move for summary judgment on Defendant's tortious interference claim against the GE Parents. As Defendant recognizes, the GE Parents enjoy a qualified privilege to interfere in the Tolling Agreement because Plaintiff is their wholly owned subsidiary.[6] Defendant nevertheless contends that this privilege is negated here due to the exception which provides that a parent corporation may be liable for interference with its subsidiaries' business relationships where the parent "acted with a purely malicious purpose or used wrongful means to induce the breach of contract[.]" Dkt. 211 at 36 (quoting *Hyatt Corp. v. Epoch-Fla. Cap. Hotel Partners, Ltd.*, 6:07-CV-1260-Orl-KRS, 2008 WL 490121, at *4 (M.D. Fla. Feb. 20, 2008)). The Court disagrees.

In regard to the malice prong, Florida courts have held that "[a] qualified privilege to interfere is not negated by concomitant evidence of malice. It is only

---

[6] *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (finding that, as a general rule, "[u]nder Florida law, a defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed").

when malice is the *sole* basis for interference that it will be actionable." *McCurdy*

*v. Collis*, 508 So. 2d 380, 383 (Fla. 1st DCA 1987) (citing *Ethyl Corp. v. Balter*,

386 So. 2d 1220, 1226 (Fla. 3d DCA 1980)). Defendant's pleading, however,

makes clear that malice is not the sole basis for the GE Parents' interference. Dkt.

84 at 66 (stating that "GE Capital's acts were unjustified because GE Capital

prioritized its own bottom line over its subsidiaries' obligations[.]"). Defendant's

claim therefore hinges on the wrongful means prong.[7]

In the parent-subsidiary context, courts have not been entirely clear on what

constitutes a "wrongful" or "improper" means of contract interference. But a

handful of cases are instructive. In *Genet Co. v. Anheuser-Busch, Inc.*, 498 So. 2d

683, 684 (Fla. 3d DCA 1986), the plaintiffs contracted with an Anheuser-Busch

wholesaler to purchase wholesale rights. Pursuant to its rights in a separate contract

with the wholesaler, Anheuser ultimately refused to approve the transfer. The

plaintiffs then sued Anheuser for interfering with their separate contract, alleging

that Anheuser "wrongfully repudiated its approval of the sale." *Id.* The court

nevertheless affirmed summary judgment for Anheuser, reasoning that "Anheuser

was the source of the business opportunity which plaintiffs sought. The tort of

---

[7] *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321 (11th Cir. 2004) (stating that, in the qualified privilege to interfere context, "even where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used.") (citation omitted).

willful interference with a business relationship does not exist where the defendant was the source of the business opportunity allegedly interfered with." *Id.* (citation omitted).

In *Palm Beach County Health Care District v. Professional Medical Education, Inc.*, 13 So. 3d 1090, 1092 (Fla. 4th DCA 2009), the court extended this reasoning to reverse a jury verdict. 13 So. 3d at 1092. The plaintiff there contracted with Palm Beach County Fire Rescue and the City of Greenacres, Florida, to provide continuing education courses for emergency medical services personnel under the umbrella of a public program coordinated by the District. *Id.* at 1093. After the contract was signed, a District official informed the parties that the District would not pay for the courses. *Id.* The plaintiff then sued for tortious interference, claiming that the District's procedures were "part of [a] conspiracy to deprive [plaintiff] of business." *Id.* The court reasoned that, because "[t]he District was the source of the funds to pay for the services [plaintiff] was to provide . . . the District is not a 'stranger' to any contract that it will ultimately fund." *Id.* at 1094. Further, "to allow the tort of interference to apply in this case would be to discourage the District from being an aggressive caretaker of public funds." *Id.*

Here, the Court recognizes that the GE Parents are not stewards of public funds or in a wholesaler relationship with Plaintiff. Notwithstanding, the GE Parents are the source of both the business opportunity which Plaintiff sought and

the funds and expertise that made possible the services Defendant was to provide. In light of this, the GE Parents' significant hand in selecting and securing Defendant's financing under the Tolling Agreement does not constitute improper or wrongful contract interference. Forwarding financing options that were allegedly inconsistent with Plaintiff's rights, moreover, cannot be equated to a purposeful inducement of breach where the contract itself can be reasonably interpreted to provide otherwise and where Defendant fails to provide non-conclusory evidence of such an intent through discovery. It is important to note that this inquiry ultimately goes to the "intentional and unjustified" element of tortious interference. And, here, neither sub-element is sufficiently alleged by Defendant to overcome the strong privilege enjoyed by the GE Parents.

Defendant relies on *Hyatt* to argue otherwise, but that ruling denied a motion to dismiss and is highly distinguishable. 2008 WL 490121, at *1. To begin, the counterclaimant there was not alleging that the parent corporation purposefully induced breach by merely forwarding financing that the counterclaimant found objectionable. Indeed, the tortious interference in *Hyatt* revolved around a franchise agreement that was terminated by the parent's subsidiary on pretextual grounds. *Id.* at 1–2. In the instant case, Defendant provided Plaintiff with a notice terminating the Tolling Agreement first. Dkt. 175 at 42. Additionally, unlike in

34

*Hyatt*, the instant case presents no evidence of an intent to financially harm the other party based on a larger backdrop of business competition.

Defendant's position is also inconsistent with the rationale underlying tortious interference. As the *Palm Beach County Health Care District* court aptly put it:

> [t]he cause of action for tortious interference with a business relationship recognizes that economic relations are entitled to freedom from unreasonable interference. The point of a business relationship is to advance the interests of the parties involved. Tortious interference protects the interests of parties to an agreement against interference by outsiders, who would not be liable otherwise for breach. In the case of an interested third-party, the contractual interests that tortious interference is intended to protect *include* the interests of the third-party with respect to the contract. An interested third-party accused of tortious interference is essentially "interfering" with its own interests. This is not interference; it is freedom of contract.

13 So. 3d at 1095 (citations and internal quotations omitted).

That being the case, the GE Parents cannot be said to have improperly interfered with the Tolling Agreement by inducing Plaintiff to present financing documents to which Defendant objected. The Court accordingly grants Third-Party Defendants summary judgment on Plaintiff's tortious interference claim.[8]

### III.    Defendant's Motion for Summary Judgment

---

[8] Defendant further claims that the GE Parents also "disrupted [its] performance under the Agreement by requiring the law firm Orrick, Herrington & Sutcliffe LLP ('Orrick') to withdraw its representation of [Defendant], even though the issue could have simply been resolved with a conflict waiver." Dkt. S-220 at 29 n.17. It is clear, however, that this representation created a waiver issue that impacted applicable rights because Orrick previously represented GE entities. Consequently, Defendant cannot show that any of the GE Parents' interference was unjustified.

Defendant moves for summary judgment on a) Count I of Plaintiff's Amended Complaint as it relates to contract breach damages; b) Count I of Plaintiff's Amended Complaint as it relates to contract breach liability; c) Count II of Plaintiff's Amended Complaint (breach of the implied covenant of good faith and fair dealing); and d) Count III of Plaintiff's Amended Complaint (request for declaratory relief). Dkt. 175 at 9–10.

Following the Court's denial of summary judgment for Plaintiff on Count III of Plaintiff's Amended Complaint, the Court grants summary judgment for Defendant on the same count and necessarily denies any declaratory relief to Plaintiff. The remainder of Defendant's summary judgment arguments will be discussed in turn.

   a) *Count I (Damages)*

      i)   *Termination Damages*

First, Defendant argues that Plaintiff is not entitled to termination damages under section 12.5(b) of the Tolling Agreement because "Demonstrated Capacity" is a requisite input of the section 12.5(b) formula and it has not been established. Dkt. 175 at 14–15. According to Defendant, "the only way to establish the Demonstrated Capacity is by successfully completing the Performance Test portion of the Commercial Operation Test." *Id.* at 15. Yet, because the Facility was never built or tested, Plaintiff cannot do so. Accordingly, Defendant maintains that

Plaintiff's termination damages calculation—which uses "Expected Demonstrated Capacity" as a substitute—constitutes a rewrite of section 12.5(b) aimed at providing itself with a massive windfall.

Plaintiff responds that Defendant's "breach waived any pre-condition on the availability of termination damages." Dkt. 209 at 32. Under this theory, because the nonoccurrence of the essential "condition precedent" for termination damages (the Facility being built and tested) "rests solely on [Defendant's] breaching conduct[,]" the doctrine of prevention applies. *Id.* at 33–34. Thus, Defendant "cannot now invoke the nonoccurrence of the Commercial Operation Test that it prevented from occurring to ascertain Demonstrated Capacity." *Id.* at 34.

Plaintiff's prevention theory is unavailing. "The doctrine of prevention of performance applies, generally, when a party to a contract is ready, willing and able to perform, but the other party prevents him from performing by imposing obstacles not contemplated within the contract[.]" *Buckley Towers Condo., Inc. v. QBE Ins. Corp.*, 395 F. App'x 659, 663 (11th Cir. 2010) (citations omitted). However, "there is no indication that Florida courts would apply the doctrine to change the basic terms of the underlying contract." *Id.*

The Tolling Agreement's terms do not provide that Plaintiff's obligation to build the Facility and Plaintiff's right to termination damages are conditioned on Defendant's consent to *any* financing forwarded by Plaintiff. The Tolling

Agreement, moreover, contains no language to the effect that an event of default before construction of the Facility began could result in a contractual re-write which substitutes "Expected Demonstrated Capacity" for "Demonstrated Capacity" in the termination damages formula. Rather, the Tolling Agreement appears to do the opposite by providing for direct, actual damages where "no remedy or measure of damages is expressly herein provided" and by expressly acknowledging that the liquidated damage provisions "constitute a reasonable approximation of the harm or loss[,]" thereby limiting such damages to those explicitly set forth in the contract. Dkt. 166-1 at 73.

More importantly, application of the equitable doctrine of prevention would be highly inequitable in these circumstances. "The purpose of damages is to restore an injured party to the same position that he would have been in had the other party not breached the contract." *Feldkamp v. Long Bay Partners, LLC*, 773 F. Supp. 2d 1273, 1284 (M.D. Fla. 2011) (citation omitted), *aff'd*, 453 F. App'x 929 (11th Cir. 2012). An injured party, however, "is not entitled to be placed, because of the breach, in a position better than that which he would have occupied had the contract been performed." *Id.* Notwithstanding these foundational principles, Plaintiff contends that it is entitled to a contractual amendment resulting in well

over $500 million dollars[9] in damages where Plaintiff never began building or operating the Facility. Dkt. S-192 at 20. Even Plaintiff's expert concedes that such a figure is nowhere near Plaintiff's expected loss or gain. It follows that this sum represents a windfall. And this is a bold claim given that that the physical facility never amounted to more than a large grass field.

Plaintiff and Third-Party Defendants argue that "the parties specifically agreed upon a damages calculation . . . [a]nd [that] the bar on awarding a windfall simply reflects the unremarkable notion that actual damages in the absence of a contractually specified formula should be commensurate with the injury sustained." Dkt. 209 at 37 (citations and internal quotations omitted). Yet, it is no less true that the contractually specified termination damages formula of section 12.5(b) exists and is binding. Hence, only a judicial re-write of the Tolling Agreement—which would functionally treat section 12.5(b)'s terms as nonexistent—could effectuate the calculation Plaintiff presents. The bar on awarding a windfall would then still be relevant even if the Court was inclined to agree with Plaintiff's prevention theory.

For these reasons, the Court grants Defendant summary judgment on the issue of termination damages under section 12.5(b).

---

[9] Plaintiff's expert has calculated the termination damages range to be between $549 million and $678 million dollars. Dkt. S-192 at 20.

ii)     *Economic Loss Damages*

The Parties' dispute over Plaintiff's economic loss claim relates to the textual relationship between sections 12.5, 12.9 and 12.10 of the Tolling Agreement. Thereunder, Defendant argues that section 12.5 should be interpreted as providing the only measures of "direct, actual damages," that Plaintiff's economic loss theory is essentially a lost profits theory, and that section 12.10 precludes both direct and indirect lost profits. Dkt. S-192 at 21–26. Plaintiff responds that section 12.5 does not provide the only measures of direct, actual damages, that Plaintiff's economic loss theory is a form of direct, actual damages (direct lost profits), and that such damages are permissible under section 12.10. Dkt. 209 at 42–53.

"Courts are required to construe a contract as a whole and give effect, where possible, to every provision of the agreement." *Philip Morris Inc. v. French*, 897 So. 2d 480, 488 (Fla. 3d DCA 2004) (citation omitted). "[T]he court should arrive at an interpretation consistent with reason, probability, and the practical aspect of the transaction between the parties[.]" *Wright & Seaton, Inc. v. Prescott*, 420 So. 2d 623, 629 (Fla. 4th DCA 1982) (citation omitted). "[An] interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable." *PNC Bank, N.A. v. Progressive Emp. Servs. II*, 55 So. 3d 655, 658 (Fla. 4th DCA 2011) (citation omitted).

Under these construction principles, sections 12.5, 12.9, and 12.10 are properly interpreted as limiting damages to direct and actual damages generally, not to termination damages and costs only. Section 12.5 provides that, "[u]pon the termination of this Agreement under this Section 12.5, the non-defaulting Party shall be entitled to receive all the direct actual damages incurred by the non-defaulting Party as follows[.]" Dkt. 166-1 at 70. Section 12.9 then provides that, "[s]ubject to the exclusivity of Delay Damages . . . and the limitations on damages set forth in Sections 12.5 and 12.11,[10] each right or remedy of the Parties provided for in this Agreement shall be cumulative[.]" *Id.* at 73. Defendant argues that section 12.9's "limitations on damages" language should be used to interpret the preceding section 12.5 language as a complete bar on direct, actual damages not explicitly set forth in sections 12.5(b) and (c). But Defendant's proffered interpretation would render section 12.10's language superfluous or meaningless. Indeed, section 12.10 expressly provides that:

> The Parties confirm that the express remedies and measures of damages provided in this Agreement satisfy the essential purposes hereof. If no remedy or measure of damages is expressly herein provided, the obligor's liability shall be limited to direct, actual damages only.

*Id.*

---

[10] Section 12.11 addresses the "Duty to Mitigate" and is largely irrelevant for this analysis. Dkt. 166-1 at 73.

Defendant's understanding of section 12.9 is not supported by the language of section 12.5 either. Section 12.5 states that the non-defaulting party shall be entitled to receive *all* the direct, actual damages of section 12.5, not *only* those. These terms are not commonly interchangeable. Within the larger structure of section 12.5, moreover, the plain meaning of "all" makes sense in conjunction with "as follows" as a means of avoiding mutual exclusion between sections 12.5(b) and (c). Thus, section 12.9 cannot reasonably be given the superordinate meaning that Defendant ascribes to it without undermining both sections 12.5 and 12.10.[11]

The next issue is whether Plaintiff's economic loss theory—which essentially addresses lost profits—constitutes a claim for direct, actual damages. "While case law often refers to lost profits as consequential damages, lost profits do not *always* constitute consequential damages as a matter of law. For example, '[l]ost profits are recoverable as general damages where they flow directly and immediately from the breach of a contract.'" *HCA Health Servs. of Fla., Inc. v. CyberKnife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469, 471 n.2 (Fla. 4th DCA 2016) (quoting *Bird Lakes Dev. Corp. v. Meruelo,* 626 So. 2d 234, 238 (Fla. 3d DCA 1993)). "Indeed, 'when the non-breaching party seeks only to recover money

---

[11] Defendant also avers that section 12.10 should yield to section 12.5 because "general language of a contract must yield to specific language which deals with the matter at issue." *Burger King Corp. v. Hinton, Inc.*, 203 F. Supp. 2d 1357, 1362 (S.D. Fla. 2002) (citation omitted). This argument is misplaced because the only contradiction between sections 12.5 and 12.10 is the one Defendant reads in through the general language of section 12.9.

that the breaching party agreed to pay under the contract, the damages sought are general damages.'" *Id.* (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 109 (Fla. 2d Cir. 2007)). Plaintiff's economic loss theory generally seeks to recover money that Defendant agreed to pay under the Tolling Agreement.[12] Accordingly, it addresses *direct* lost profits.

This brings the Court to the final sub-issue underlying Plaintiff's economic loss claim; that is, whether the Tolling Agreement bars direct loss profits. The Parties' opposing positions on this issue revolve around the following section 12.10 language: "[n]either Party shall be liable to the other Party for consequential, incidental, punitive, exemplary or indirect damages, lost profits or other business interruption damages by statute, in tort or contract ('Indirect Damages')[.]" Dkt. 166-1 at 73. Defendant argues that "lost profits" plainly refers both to those that are direct and indirect. Dkt. 175 at 26. Plaintiff argues that the subsequent use of "('Indirect Damages')" modifies the meaning of "lost profits" to include only those that are indirect. Dkt. 209 at 48.

After carefully reviewing the caselaw presented by both Parties and the language of the Tolling Agreement itself, the Court finds that section 12.10 uses

---

[12] Even so, Plaintiff's expert estimated Plaintiff's economic loss based on Plaintiff's anticipated revenue during the entire 30-year term of the Tolling Agreement, less expenses. It is unclear whether Defendant would have gone 30 years without exercising its purchase option thereunder. Accordingly, not all of the money Plaintiff attempts to claim on this direct lost profits theory is securely promised under the Tolling Agreement. Plaintiff's economic loss theory must account for the first purchase option contingency to retain its "direct" classification.

"('Indirect Damages')" as a set designator for the preceding series of terms which includes "lost profits." This set, moreover, is purposefully differentiated from the "direct, actual damages" discussed earlier in section 12.10. As such, direct lost profits are definitionally excluded from the term "lost profits" as it is used here, and Plaintiff may recover them under the Tolling Agreement.

In *In re Buffalo Coal Co.*, 424 B.R. 738 (Bankr. N.D.W. Va. 2010), a bankruptcy court interpreted a nearly identical damages provision. That provision provided that:

> THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSE HEREOF[.] ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY HEREIN PROVIDED, THE LIABLE PARTIES' LIABILITY SHALL BE LIMITED TO **DIRECT ACTUAL DAMAGES** ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES AT LAW OR EQUITY SHALL BE WAIVED . . . . NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, **LOST PROFITS,** OR OTHER BUSINESS INTERRUPTION DAMAGES . . . .

*Id.* at 743.[13] The bankruptcy court found that, "[t]o give effect to both the allowance and disallowance language of § 9.7, the exclusion of 'lost profits' as an

---

[13] Compare with section 12.10 of the Tolling Agreement:

> The Parties confirm that the express remedies and measures of damages provided in this Agreement satisfy the essential purposes hereof. If no remedy or measure of damages is expressly herein provided, the obligor's liability. With respect to all provisions of this Agreement that require a Party to pay liquidated damages in lieu of actual damages, the Parties acknowledge that in such instances, actual damages are difficult or impossible to determine, that otherwise obtaining an adequate

element of damage must necessarily relate to that term's meaning as an element of consequential damage—not direct damage." *Id.* at 746. The court further explained that  "'lost profits' is listed in the same string of excluded damages as 'consequential, incidental, punitive, exemplary or indirect damage . . . or other business interruption damages.' In context, the exclusion of 'lost profits' serves the similar purpose as the other exclusions—limiting a party's right to recover indirect damages." *Id.*

This reasoning is directly appliable to section 12.10 of the Tolling Agreement due to the aforementioned overlap in contract language and structure. And it is only strengthened by section 12.10's inclusion of "('Indirect Damages')" as a set designator.

Defendant responds by citing caselaw favorable to its own position. But its most persuasive case, *Cont'l Holdings, Ltd. v. Leahy*, 132 S.W.3d 471 (Tex. App. 2003), is distinguishable. There, the court found that the subject damages provision precluded direct lost profits because "[t]he plain, ordinary, and generally accepted

---

remedy is inconvenient, and that the liquidated damages constitute a reasonable approximation of the harm or loss shall be limited to direct, actual damages only. Neither Party shall be liable to the other Party for consequential, incidental, punitive, exemplary or indirect damages, lost profits or other business interruption damages by statute, in tort or contract ("Indirect Damages"); provided, that if a Party is held liable to a third party for Indirect Damages and is entitled to indemnification therefor from the other Party hereto, the Indemnifying Party shall be liable for, and obligated to reimburse the Indemnified Party for, such damages.

Dkt. 166-1 at 73.

meaning of the term 'loss of profits' includes 'direct' damages and 'indirect' damages." *Id.* at 477. Be that as it may, *Leahy* involved a far less complicated damages provision which contained neither a modifier for "loss of profits" nor any juxtaposed direct damages language.[14] The *Leahy* court also found that "Continental's requested remedy [was] inconsistent with the [contract's] early termination remedy." *Id.* at 477. Thus, unlike in the instant case, there was no reason to depart from the plain meaning of "lost profits." Rather, there was good reason not to.

For these reasons, the Court denies summary judgment for Defendant on Plaintiff's economic loss claim insofar as that claim pertains to contractually secured payments from Defendant until the first purchase option or buy-out date. In other words, Plaintiff must still account for the fact that section 11.2(a) provides Defendant with its first purchase option on June 1, 2023, thereby creating a temporal limitation on direct lost profit damages. Dkt. 166-1 at 63.

By estimating economic loss based on Plaintiff's anticipated revenue during the entire term of the Tolling Agreement, Plaintiff's expert fails to account for the first purchase option. Lost profits post-dating this first purchase option are not securely promised under the Tolling Agreement. They consequently fail to qualify

---

[14] The provision there read as follows: "Neither [Western] or [Continental] shall bear any liability to the other for loss of production, loss of profits, loss of business or any other indirect or consequential damages, including, inter-alia, special and punitive damages." *Id.* at 475.

as direct, actual damages and are barred by the contract. *See Burger King Corp. v. Berry*, No. 18-20435-CIV, 2020 WL 8254494 (S.D. Fla. Dec. 22, 2020) (stating that "when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages") (citation omitted), *appeal dismissed*, No. 21-10180-AA, 2021 WL 1566244 (11th Cir. Mar. 18, 2021)). Any such economic damages which assume revenue beyond the first buy-out date are speculative. Under Plaintiff's theory, revenue is guaranteed until that date and not guaranteed afterward. Direct, actual damages therefore stop at that date and may not be recovered beyond it.

### iii) *Costs Incurred Damages*

Defendant's final damages argument addresses Plaintiff's claim for reliance damages. Specifically, Defendant maintains that section 20.20 of the Tolling Agreement provides that the Parties were to be responsible for the costs of their performance under the contract, including constructing the Facility. Thus, because Plaintiff's reliance damages relate only to costs incurred by Plaintiff in trying to perform, such damages are precluded. The Court agrees.

Section 20.20 provides that:

Whether or not the transactions contemplated by this Agreement ultimately are consummated, each Party shall bear all of its own costs and expenses incurred in connection with the negotiation, execution and subsequent performance under this Agreement.

Dkt. 166-1 at 92. This language clearly bars damages that solely relate to contractually obligated performance under the Tolling Agreement. Further, as Defendant notes, Plaintiff's expert admits that his reliance damages calculation consists entirely of costs incurred in connection with Plaintiff's performance. Dkt. S-191 at 85, 94. Plaintiff presents no evidence to the contrary.

Plaintiff also presents no reason for the Court to disregard the plain language of section 20.20. To be sure, Plaintiff's suggestion that the "specific authorization of direct, actual damages" in section 12.10 overcomes the "general language" of section 20.20 is backwards. Dkt. S-208 at 53. Section 20.20 specifically and unequivocally excludes performance costs. If either provision's language is to be considered more general, it is the one that fails to define the particular sub-set of damages excluded or included. That characterization fits section 12.10, not section 20.20. Hence, because the "general language of a contract must yield to specific language which deals with the matter at issue[]," *Burger King Corp. v. Hinton, Inc.*, 203 F. Supp. 2d 1357, 1362 (S.D. Fla. 2002) (citation omitted), section 12.10 must yield to section 20.20.

The Court therefore grants Defendant summary judgment on the issue of reliance damages. The Tolling Agreement requires each party to bear its own costs and expenses of its own performance. These damages are not recoverable.

*b) Count I (Liability)*

Defendant also requests summary judgment concerning liability on Plaintiff's breach of contract claims. Dkt 175 at 31–38. Because Plaintiff and Defendant's breach claims represent two sides of the same coin, however, disposing of Plaintiff's claims would similarly require the Court to resolve the issue of whether Plaintiff's long-term financing could remain in place if Defendant exercised its purchase option. For the reasons discussed above, the Court finds this to be an intent-based issue of fact better left for the jury. Accordingly, the Court denies Defendant summary judgment on this point.

c) *Count II*

Finally, Defendant moves for summary judgment on Plaintiff's alternative claim for breach of the implied covenant of good faith and fair dealing. Defendant argues that, because Plaintiff's claim "is based on the exact same allegations giving rise to [Plaintiff's] breach of contract claim—namely, that [Defendant] allegedly failed to comply with its obligations to sign the proposed Financing documents and negotiate in good faith a Lease for the adjacent property[,]" it must be dismissed as impermissibly duplicative. Dkt. 175 at 38–39.

As Defendant notes, "Florida law is clear—where a claim for breach of the covenant of good faith and fair dealing is indistinguishable from a claim for breach of contract, the claim for breach of the covenant of good faith and fair dealing is impermissibly duplicative and properly dismissed." *Sun Life Assurance Co. of*

49

*Canada v. Imperial Holdings Inc.*, No. 13-80385-CIV, 2016 WL 10565034 (S.D. Fla. Sept. 22, 2016) (collecting cases). But Plaintiff's claims are distinguishable here because some of the facts giving rise to Plaintiff's implied covenant claim are unique. For instance, Plaintiff has alleged that Defendant "repeatedly placed its own commercial interests ahead of [Plaintiff's] rights under the Tolling Agreement." Dkt. 209 at 25. As such, the Court denies Defendant summary judgment on this point as well.

## CONCLUSION

This is a contract dispute between Plaintiff Shady Hills and Defendant Seminole. Those parties will meet at a jury trial to present their contract and implied covenant breach claims.

According, it is hereby **ORDERED** and **ADJUDGED**:

(1) Plaintiff's Motion for Partial Summary Judgment (Dkt. 171) is

   **GRANTED-IN-PART** and **DENIED-IN-PART**. Plaintiff is granted

   summary judgment on Defendant's negligent misrepresentation

   counterclaim, declaratory judgment counterclaim, and rescission

   counterclaim;

(2) Third-Party Defendants' Motion for Summary Judgment (Dkt. 172) is

   **GRANTED-IN-PART** and **DENIED-IN-PART**. Third-Party

   Defendants are granted summary judgment on Defendant's third-party

claims of breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and tortious interference;

(3) Defendant's Motion for Summary Judgment (Dkt. 175) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Defendant is granted summary judgment in part on Plaintiff's claim for economic damages and in whole on Plaintiff's claim for termination and reliance damages.

**DONE AND ORDERED** at Tampa, Florida, on October 3, 2022.


*/s/ William F. Jung*_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO**:
Counsel of Record