# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**SHADY HILLS ENERGY CENTER, LLC**,

    Plaintiff and Counter-Defendant,

  v.

**SEMINOLE ELECTRIC COOPERATIVE, INC.**,

    Defendant, Counter-Plaintiff, and Third-Party Plaintiff,

Case No. 8:20-cv-81-WFJ-JSS

  v.

**EFS SHADY HILLS EXPANSION HOLDINGS, LLC; EFS SHADY HILLS, LLC; GENERAL ELECTRIC CREDIT CORPORATION OF TENNESSEE, INC.; GE CAPITAL US HOLDINGS, INC.; and GE CAPITAL GLOBAL HOLDINGS, LLC**,

    Third-Party Defendants.
_____/

## ORDER

Before the Court is Seminole Electric Cooperative, Inc.'s ("Seminole") Motion to Strike the Supplemental Expert Report of Frank Graves or, in the alternative, for Partial Summary Judgment (Dkt. 291). The Shady Hills Parties[1] have

---

[1] The Shady Hills Parties include: Shady Hills Energy Center, LLC; EFS Shady Hills Expansion Holdings, LLC; EFS Shady Hills, LLC; GE Capital Global Holdings, LLC; GE Capital US Holdings, Inc.; and General Electric Corporation of Tennessee, Inc.

responded in opposition (Dkt. 305), and Seminole has replied (Dkt. 307). Upon careful consideration, the Court grants Seminole's Motion.

## FACTUAL BACKGROUND

This dispute arises from a failed contract between Seminole and Shady Hills Energy Center, LLC ("Shady Hills"). In March 2016, Seminole issued a request for proposals seeking a contractor to provide for Seminole's anticipated power supply needs. Dkt. 171 at 9; Dkt. 175 at 10. GE Energy Financial Services ("GE EFS")[2] was selected. *Id.* And, on December 15, 2017, Seminole and Shady Hills—a special purpose vehicle created by GE EFS to facilitate the project—executed the Tolling Agreement.[3] Dkt. 171 at 10, 17.

Under the Tolling Agreement, Shady Hills was responsible for developing, financing, constructing, operating, and owning a natural gas-fired electric generation plant ("the Facility"). *Id.* at 17; Dkt. 175 at 11. Seminole, in turn, was to purchase the Facility's output at a fixed price for thirty years subject to a purchase option. Dkt. 171 at 17; Dkt. 175 at 11.

In early 2019, a dispute arose concerning Shady Hills' proposed financing. Dkt. 171 at 19–20; Dkt. 175 at 11–12. Seminole informed Shady Hills that, in

---

[2] GE EFS is a business unit of Third-Party Defendant GE Capital Global Holdings.

[3] In this case, the term "Tolling Agreement" is used. It means the main contract at issue here. The term does not mean an agreement to stop or "toll" the running of a period of time or period of limitation.

Seminole's view, the proposed consent and intercreditor agreements were contrary to Seminole's interests as established by the Tolling Agreement and attached Purchase and Sale Agreement ("Form PSA"). Dkt. 171 at 19–20; Dkt. 175 at 11–12. Seminole refused to sign the proposed financing agreements. Reconciliation attempts failed, and Shady Hills never built the Facility. Dkt. 171 at 19–20; Dkt. 175 at 11–12.

On March 6, 2020, Seminole provided Shady Hills with a notice terminating the Tolling Agreement. Dkt. 175 at 42. Shady Hills served a similar notice to Seminole on May 14, 2020. Dkt. 171 at 21.

## PROCEDURAL BACKGROUND

On May 18, 2020, Shady Hills filed its Amended Complaint against Seminole alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and requesting a declaratory judgment concerning the enforceability of the Form PSA. Dkt. 52 at 25–27. Seminole responded with a Motion to Dismiss, Dkt. 57, which the Court denied in full, Dkt. 62.

Seminole filed its Answer on July 16, 2020. Dkt. 65. Seminole denied all claims, raised nine affirmative defenses, and collectively asserted eight counts against the Shady Hills Parties. *Id.* The Shady Hills Parties responded with a motion to dismiss, Dkt. 76, which the Court granted-in-part and denied-in-part, Dkt. 80.

On October 20, 2020, Seminole filed its Amended Answer alleging five counterclaims and seven third-party claims. Dkt. 84. Against Shady Hills, EFS Shady Hills, EFS Shady Hills Expansion Holdings, and General Electric Credit Corporation of Tennessee, Seminole alleged breach of contract, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation. *Id.* at 53–60. Against GE Capital US Holdings and GE Capital Global Holdings, Seminole alleged tortious interference with contract and negligent misrepresentation. *Id.* at 65–68. Seminole also requested a declaratory judgment concerning the termination of the Tolling Agreement and the enforceability of the Form PSA while seeking rescission in the alternative. *Id.* at 60–64.

Following discovery, both sides filed for summary judgment. Dkt. 171; Dkt. 172; Dkt. 175. The Court ultimately found that "[t]his is a contract dispute between Plaintiff Shady Hills and Defendant Seminole." Dkt. 267 at 50. Accordingly, the Court's Summary Judgment Order narrowed the claims at issue to Shady Hills and Seminole's competing contract and implied covenant claims. *Id.* at 50.

The Court's Order also significantly limited the damages available under the Tolling Agreement. Pertinent to the matter now at issue, the Court found that Shady Hills' economic loss damages are limited to direct lost profits in the form of "contractually secured payments from [Seminole to Shady Hills] until the first

4

purchase option or buy-out date." *Id.* at 46. Any "[l]ost profits post-dating this first purchase option are not securely promised under the Tolling Agreement." *Id.*

On October 14, 2022, approximately one week after the Court's Order, Shady Hills' damages expert, Frank Graves, supplemented his original damages report. Dkt. 290-2. Seminole now moves to strike Mr. Graves' supplemental report pursuant to Federal Rule of Civil Procedure 26. Dkt. 291 at 13. In the alternative, Seminole requests the Court dismiss Shady Hills' supplemental damages claims as a matter of law pursuant to Federal Rule of Civil Procedure 56. *Id.* at 22.

## LEGAL STANDARDS

### I.     Fed. R. Civ. P. 26

Rule 26(a)(2) "governs disclosures of expert witnesses." *Bingham v. Baycare Health Sys.*, No. 8:14-CV-73-T-23JSS, 2016 WL 5106946, at *1 (M.D. Fla. Sept. 20, 2016). Thereunder, an expert report must contain "a complete statement of all opinions [the expert witness] will express and the basis and reasons for them" as well as "the facts or data considered by the witness in forming the opinions." Fed. R. Civ. P. 26(a)(2)(B). "A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure . . . if the party learns that . . . the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties[.]" Fed. R. Civ. P. 26(e)(1).

"Unless the court orders otherwise, [final pretrial] disclosures must be made at least 30 days before trial." Fed. R. Civ. P. 26(a)(3). "Any additions or changes to [the information included in the expert report and information given during the expert's deposition] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). "If a party fails to provide information as required by the expert disclosure rules, the court is entitled to exclude the expert testimony at trial, Fed. R. Civ. P. 37(c)(1), or it 'may impose other appropriate sanctions[.]'" *Bingham*, 2016 WL 5106946, at *1 (quoting *Prieto v. Malgor*, 361 F.3d 1313, 1318 (11th Cir. 2004)).

## II.     Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party and must resolve any reasonable doubts in the non-moving party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

Shady Hills' supplemental damages report presents a lost profits theory that contains two components: (1) lost income profits, and (2) lost purchase option profits. Dkt. 290-2 at 7. "The first component calculates the value of [Shady Hills'] equity interest as of the Breach Date" by relying "on [Shady Hills'] net income[.]"

7

*Id.* "The second component . . . [calculates] the price of the assumed First Purchase Option[.]" *Id.* Shady Hills merely adds these two components to arrive at its new direct lost profits figure—approximately $80 million (with pre-judgment interest). *Id.* at 14.

Seminole takes issue with the entirety of Shady Hills' supplemental report under Rule 26. Dkt. 291. Because Seminole attacks each component of Shady Hills' lost profits theory on unique Rule 56 grounds, however, the Court will address the components individually.

### I.     Lost Purchase Option Profits

Lost profits from Seminole's potential exercise of its first purchase option are not recoverable. The Court's Order did not presume that Seminole would exercise this option, nor did it transform potential purchase option payments into contractually secured payments to Shady Hills or any Shady Hills Party. These damages remain speculative and are therefore excluded by Section 12.10 of the Tolling Agreement. Dkt. S-193-1 at 69.

The Court temporally limited Shady Hills' direct lost profits to the payments Seminole would make to Shady Hills up until Seminole's first purchase option for one reason: they are the only contractually secured payments from Seminole to Shady Hills (i.e., the only form of lost profit damages available to Shady Hills under the Tolling Agreement). Dkt. 267 at 40–47. Shady Hills' position—that, in so doing,

8

the Court presumed that Seminole would have exercised the first purchase option—misunderstands this basic fact. *See* Dkt. 305 at 16.

Shady Hills' confusion appears to stem from the Tolling Agreement's purchase option structure. At each purchase option, Seminole had two choices: (1) decline the option *and* continue making payments, or (2) exercise the option *and* cease making payments. Thus, because the Court's Order barred payments after the first purchase option, Shady Hills argues that the Court necessarily foreclosed choice one and adopted choice two. *Id.*

This is not the case. The Court foreclosed both choices as to Shady Hills because choice two (Seminole exercising the option and ceasing standard payments) is itself a divergence that precludes purchase option payments from being secured by Shady Hills. Indeed, upon ceasing standard payments and exercising its first purchase option, only the owner(s) of Shady Hills' equity would be entitled to payment from Seminole. Dkt. S-193-1 at 60. This could have been anyone who acquired said equity prior to June 1, 2023. Moreover, evidence in this record plausibly suggests that Shady Hills' parent entities were planning to offload Shady Hills' equity prior to this date. *See* Dkt. S-295-8 at 2. Either way, there is simply no means of knowing who Shady Hills' equity holder(s) would have been had Seminole chosen to exercise its option at the first option date. Whoever the equity holder(s) ultimately would have been are not named in the Tolling Agreement.

It follows that Seminole's first purchase option only secures positive rights for one party in this contract dispute—Seminole. It does not secure payments to Shady Hills or any other Shady Hills Party, even if exercised. Accordingly, Shady Hills' only direct lost profits under the Tolling Agreement are the payments Seminole was contractually obligated to pay Shady Hills prior to Seminole's first purchase option. Anything after that remains uncertain and unrecoverable.

Further, Mr. Graves' supplemental report as to lost purchase option profits violates Rule 26. Mr. Graves' calculations concerning purchase option figures are based on the projected net book and fair market values of the Facility. Dkt. 290-2 at 10–12; Dkt. S-193-1 at 59–60. There is no indication that the underlying data on which Mr. Graves relies to project these values was unavailable prior to writing his initial report. Nothing precluded Shady Hills from presenting this wholly new lost profits theory alongside its original damage claims in Mr. Graves' initial report. Mr. Graves' late disclosures (submitted months after the close of discovery) consequently fail to qualify as supplemental under Rule 26(e). *See Alphamed Pharms. Corp. v. Arriva Pharms., Inc.,* No. 03-20078-CIV, 2005 WL 5960935, at *8 (S.D. Fla. Aug. 24, 2005) (finding that an expert's late disclosure is not supplemental where the documents on which he relies are not acquired after writing the initial report); *see also Brucker v. Lowe's Home Centers, Inc.,* No. 2:10-CV-405-FTM-29, 2012 WL 2225818, at *2 (M.D. Fla. June 15, 2012) (finding that "[a]

revised report which includes a new theory or opinion is not proper supplementation under Rule 26(e)").

"When a party fails to comply with Rule 26, the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation was either justified or harmless." *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225 *5 (S.D. Fla. June 2, 2016) (citations omitted). Shady Hills cannot meet this burden. Neither side conducted discovery on the projected net book or fair market values of the Facility (issues that have not been put forth for the nearly three years that this litigation has been pending). In order to cure its surprise and meaningfully contest the underlying inputs of Mr. Graves' supplemental report, Seminole would therefore need the opportunity to conduct additional discovery. This would disrupt the trial calendar and force Seminole to engage in further damages-based motion practice—especially where EFS Shady Hills intends to amend its pleading or intervene to bring a claim for lost purchase option damages in the event that the Court allows Mr. Graves' new, later report. Dkt. 305 at 5. Moreover, as explained above, Shady Hills and the Shady Hills Parties have no claim to lost purchase option damages under the Tolling Agreement. It is axiomatic that a party cannot be substantially justified in belatedly disclosing a new damages theory that can yield no recovery. Simply put, Shady Hills' late disclosures may not be considered harmless or substantially justified. They must be excluded.

## II.     Lost Income Profits

Shady Hills' new lost income profits methodology is equally problematic in light of the Court's Order. As previously mentioned, the Court denied summary judgment to Seminole on Shady Hills' economic loss claim (a lost profits theory) only "insofar as that claim pertained to *contractually secured payments from [Seminole] until the first purchase option or buy-out date*." Dkt. 267 at 46 (emphasis added). Shady Hills cannot circumvent the Court's ruling and inflate its potential recovery by utilizing "levelized demand payments" and other capital lease accrual accounting tools.[4]

To begin, levelized demand payments are not the same as the contractually secured payments that Seminole was to pay Shady Hills prior to the first purchase option. As Mr. Graves explains, "a levelized payment . . . is a way of reflecting a smoother pattern of payment that has the same present value as the less smooth, original or alternative payment schedule." Dkt. S-295-3 at 21. In other words, Shady Hills' leveling involves hypothetically "rearrang[ing] the timing" of Seminole's demand payments as dictated by the Tolling Agreement for accounting purposes. *Id.* This explains why Mr. Graves agrees that his "new lost profits analysis does not use

---

[4] Shady Hills also attempts to expand the Court's temporal limitation by including demand payments that Seminole might have paid to Shady Hills during the "Buyer Purchase Option Due Diligence" period. *See* Dkt. 193-1 at 59. While some amount of payment likely may have occurred during this period, these payments are not certain or contractually secured. As the Court established in its Order, Shady Hills' direct lost profits damages are limited to the period before the first purchase option or buy-out date.

the revenues that actually would have been paid by Seminole over the [subject] period; but instead, it uses accounting revenues that include revenues that Seminole would have paid after the purchase option[.]" *Id.* at 30.

More importantly, in the instant context, Mr. Graves' accounting methods do not capture the direct lost profit damages that Shady Hills potentially suffered and can recover under the Tolling Agreement. The disconnect between the *direct lost profits* the Court allowed in its Order and the lost profits Shady Hills now claims based on Mr. Graves' supplemental report is readily apparent from an examination of Mr. Graves' second deposition. The following exchanges are particularly salient:

> Q: And there's nothing in your numbers that covers the costs of the principal of the debt that would be necessary to build the plant, correct? You don't deduct those?
>
> A: That would normally not be an income statement deduction, that's correct.
>
> . . .
>
> Q: And your use of the net income line for lost profits for this two-year, roughly, period, if you take that net income line out to 30 years, it adds up to over a billion dollars in lost profits or net income, correct?
>
> A: That is true.

Dkt. S-295-3 at 30–31. The Court fails to see how one billion dollars can serve as an appropriate benchmark for direct lost profit damages where neither side dreamed of realizing such a figure in real world profits. Moreover, nothing in the Tolling Agreement indicates that Seminole's demand payments could actually be rearranged

13

in the event that Seminole planned on exercising its purchase option. This is an accounting fiction.

Mr. Graves' methodology, while perhaps appropriate in the business or tax contexts of a deal such as this one, is not appropriate here. Direct lost profits under Florida law do not equate to lost income without qualification of expenses and debt. Shady Hills cannot present this supplemental lost profits theory to the jury.[5]

## CONCLUSION

The parties drafted and executed a contract that severely limited the damages available to the non-breaching party in the event of a breach by the other side. Thereunder, the only lost profits available to Shady Hills are direct lost profits in the form of contractually secured demand payments that Seminole was to pay prior to the first purchase option. Shady Hills new and untimely lost profits theories reach beyond this limitation and are therefore barred as a matter of law.

---

[5] This portion of Mr. Graves' supplemental report also violates Rule 26. First, Mr. Graves' late disclosure is not supplemental because the underlying data Mr. Graves relies on for Shady Hills' updated lost income profits theory was available at the time of Mr. Graves' initial report. Second, there is no substantial justification for this belated disclosure, as the limitations on direct lost profits set by the Tolling Agreement have remained the same since the Tolling Agreement's execution. Third, the surprise and potential harm to Seminole is apparent. Any attempt to cure Seminole's surprise would require an amendment to the trial schedule and a reopening of discovery. The Court will not facilitate this disruption given the fact that Shady Hills is not entitled (as a matter of law based on the contract) to the indirect economic loss damages it now attempts to relabel as direct lost profits.

Accordingly, it is hereby **ORDERED** and **ADJUDGED**: Seminole's Motion to Strike the Supplemental Expert Report of Frank Graves or, in the alternative, for Partial Summary Judgment (Dkt. 291) is **GRANTED**.

**DONE AND ORDERED** at Tampa, Florida, on March 7, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record